**CLERK'S OFFICE**
**A TRUE COPY**
Nov 20, 2020
s/ Daryl Olszewski
**Deputy Clerk, U.S. District Court**
**Eastern District of Wisconsin**

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)
Information associated with the cellular )
telephone assigned call number (262) 412-0919 )

Case No.  20   MJ   245

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C., Sections 844 (i),(n) | Conspiracy to commit arson; arson |

The application is based on these facts:

See the attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Digitally signed by RICKY HANKINS
DN: c=US, o=U.S. Government, ou=Dept of Justice, ou=ATF,
cn=RICKY HANKINS, 0.9.2342.19200300.100.1.1=1500100169456
Date: 2020.11.20 13:07:23 -06'00'

ATF SA Rick Hankins

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone _____ *(specify reliable electronic means).*

Date: November 20, 2020

*Judge's signature*

City and state: Milwaukee, WI

Hon. William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

### Matter No. 2020R00324

I, Rick Hankins, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number (262) 412-0919 (the "Subject Phone" or the "Account") that is stored at premises controlled by Metro PCS (T-Mobile), a wireless telephone service provider headquartered at 4 Sylvan Way in Parsippany, NJ 07054 (the "Provider").  The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require the Provider to disclose to the government copies of the information further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.      I am a Special Agent of the United States Justice Department's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Milwaukee Field Office. I have been so employed since April 2003. My duties as a Special Agent with ATF include investigating alleged violations of the federal firearms, explosives, and arson statutes.

3.      I have completed approximately 26 weeks of training at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as the ATF National Academy.  That training included various legal courses related to constitutional law as well as search and seizure authority. Additionally, I have received training on how to conduct various tasks

associated with criminal investigations, such as interviewing, surveillance, and evidence collection.

4.     In addition to my duties as a criminal investigator, I am also an ATF Certified Fire Investigator (CFI). As an ATF CFI, I am tasked with providing expert opinions as to the origin and cause of fires. I obtained the ATF CFI certification in 2009 following a two-year training program that centered on various fire science topics including, but not limited to: chemistry, fire dynamics, and building construction. The two-year ATF CFI certification program consisted of college courses, written exams, research papers, reading assignments, practical training exercises, and test burns of various materials. I am re-certified annually as an ATF CFI. To date, I have participated in over 270 fire scene examinations and have testified as an expert. Additionally, I have been certified as a fire investigator by the International Association of Arson Investigators since June 2011. I have received over 1,400 class hours of fire related training. Furthermore, I have been an instructor regarding fire-related topics on 38 occasions for the following agencies and institutions: The National Fire Academy (FEMA), International Association of Arson Investigators Chapter 25, Waukesha County Technical College, and Blackhawk Technical College. I have also participated in over 200 live fire training exercises, where I started training fires and observed fire growth and development. Finally, I was a full-time instructor at the ATF National Academy from August 2015 to August 2016, where I taught several topics during Special Agent Basic Training for new ATF recruits. Specifically, I was a primary instructor for the arson block of training at the ATF Academy.

5.     As an ATF agent, I have been deployed to riots involving arsons, including the Sherman Park riots in 2016 and the Minnesota riots in 2020. I know from training and experience that individuals who commit crimes during riots commonly communicate,

photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media, including Facebook.

6. I have previously applied for and received search and arrest warrants related to the crime of arson, as well as other crimes.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8. Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of conspiracy to commit arson and arson of commercial property, in violation of Title 18, United States Code, Sections 844(n) and 844(i).

## <u>PROBABLE CAUSE</u>

9. On August 23, 2020, Jacob Blake was shot multiple times by officers of the Kenosha Police Department. That incident triggered both non-violent protests and violent rioting, including numerous arsons throughout the City of Kenosha. The unrest and violence grew so dangerous that the Wisconsin National Guard eventually deployed over 1,000 individuals to keep the peace. The Government also marshaled its resources to investigate crimes in the aftermath.

10. ATF's National Response Team (NRT) and the Milwaukee Field Office, in partnership with the Kenosha Police Department, Kenosha Fire Department, Kenosha Sheriff's Office, Drug Enforcement Administration, Wisconsin Department of Justice's Division of

Criminal Investigation, and the United States Attorney's Office are focusing their efforts on identifying the persons responsible for twenty building arsons, seven vehicle arsons, and other related crimes that occurred in Kenosha between Sunday, August 23, 2020 and Tuesday, August 25, 2020. Those investigators processed scenes, collected video evidence, and identified potential witnesses, subjects, and targets. The instant warrant application is made as a part of this same investigative effort.

11.     In conjunction with other federal, state, and local law enforcement officers, I am assisting with an investigation into an arson at B&L Office Furniture, located at 1101 60th Street, in Kenosha, Wisconsin ("B&L"), on August 24, 2020. As part of the investigation into this arson at B&L, law enforcement reviewed a video publicly posted on the social media platform Twitter, which depicted a white male subject (wearing a black baseball cap, black tank top, blue surgical mask, and bearing a large left forearm tattoo, which itself featured a distinctive "straight edge" on the top) lighting a piece of material (believed to be either paper or cardboard) on fire, placing that same burning material on a table in front of B&L, and leaving the area.

12.     Law enforcement located additional footage of a person matching the description of the white male mentioned above, also generated in Kenosha on the evening of August 24, 2020. A still image generated using this same footage was released to the media, and citizens with any knowledge of this person's identity were asked to contact law enforcement at an established "tip line."

13.     A citizen who wished to remain anonymous ("CW No. 1") contacted this "tip line" and advised that his son ("CW No. 2"), who also wished to remain anonymous, was familiar with the white male described above. CW No. 1 explained that CW No. 2 was

connected on Facebook and Snapchat with a woman (later identified as Tabitha Scruggs ["Scruggs"]) whose boyfriend matched the picture released to the media. Law enforcement interviewed CW No. 2, at which point CW No. 2 (i) explained that Scruggs' Facebook profile name was "Tabby Abby"; and (ii) provided a still photo associated with that same Facebook profile, which depicted Scruggs' boyfriend Devon Vaughn ("Vaughn"). In the picture, Vaughn is wearing the same hat as the B&L arsonist and displays a tattoo on his left forearm with a straight edge in the same location as the B&L arsonist.

14.     On September 3, 2020, law enforcement interviewed Scruggs outside of 3827 Republic Avenue in Kenosha, WI. This is the residence of Scruggs' grandmother, Eileen Scruggs ("Eileen").

15.     Eileen initially answered the door, at which point law enforcement asked if "Tabitha" lived at the residence.  Eileen responded that they had just missed her.  Eileen eventually offered to call Scruggs.  This call was placed, and Scruggs arranged to return to the residence.

16.     While waiting for Scruggs to return, law enforcement asked Eileen if she knew of Scruggs' boyfriend.  Eileen said she did, and his name was Devon.

17.     Law enforcement showed Eileen a picture of Devon, from Scruggs' Facebook account, and asked Eileen if that was Devon, Scruggs' boyfriend.  Eileen said it was.

18.     When Scruggs returned to the residence, law enforcement interviewed her. Initially Scruggs stated she went to downtown Kenosha by herself, but she eventually acknowledged going downtown with her friend Devon.  Scruggs claimed she did not know

Devon's last name or cell phone number. Scruggs stated she had known Devon for three months and that they had originally met through Facebook.

19.     Scruggs stated that Devon drove her, using her vehicle, to downtown Kenosha during the night of "the shooting" in Kenosha. She further stated that Devon continuously left her while they were downtown, and she was not around him for a majority of the time. Scruggs claimed she kept trying to call Devon because she wanted to leave, and Devon told her to just leave him if she did not want to stay. Scruggs ended up leaving Devon downtown because he did not want to leave.

20.     Later that day, law enforcement met again with Scruggs, at her request. Law enforcement showed Scruggs the photo of Vaughn taken during the B&L arson, and asked Scruggs if she thought it was her boyfriend. Scruggs initially stated she did not know if that was him or not. After looking at the photo for a while, Scruggs stated the photo did "kind of" look like him, and that the hat and tattoo did look like Devon's.

21.     Scruggs and her counsel signed a "proffer letter" with the government, whereby Scruggs agreed to provide "a complete and truthful account of all information she has regarding all criminal wrongdoing perpetrated by herself or others." This "proffer letter" contained what is colloquially referred to as a "*Kastigar* waiver," which provided that the government was entitled "to use information derived directly or indirectly from [Scruggs'] statements for the purpose of obtaining and pursuing leads to other evidence, which derivative evidence may be used for any purpose, including any prosecution of her by the United States."

22.     On October 15, 2020, Scruggs and her counsel met with the government for this proffer interview. Law enforcement does not believe that Scruggs was fully truthful during that conversation, but she did make certain statements that (i) the government believes were

truthful; and (ii) support the instant warrant application. To wit: Scruggs acknowledged entering the B&L furniture store with Vaughn the night of the arson. Scruggs further stated that she personally saw Vaughn start a fire inside the store.

23.     During this same interview, the government showed Scruggs a photograph (obtained from a publicly-available source) depicting the inside of the B&L furniture store the night of the arson. Scruggs acknowledged that (i) she was the female figure in the photo, and (ii) Vaughn was the figure in the black tank top to the far left.  Scruggs said she was either videotaping or watching the fire in this photo, and she initialed the photo to commemorate her identifications.

24.     Scruggs claimed she did not know the name of the third person in the photo, but law enforcement believes it may be Jason Belotti, based on the following facts.

25.     Law enforcement, through lawful legal process, obtained phone records associated with Vaughn and Scruggs. These records revealed that both Vaughn's phone and Scruggs' phone had contact with the Subject Phone on August 24, 2020.  Scruggs' phone specifically had contact with the Subject Phone during the evening hours of August 24, 2020, during the rioting.

26.     Records maintained by the Kenosha Police Department—which are, in my experience, generally reliable—revealed  that the Subject Phone was associated with Jason Belotti.  Law enforcement has compared a known photograph of Belotti against a photo of the third figure inside the B&L Furniture at the time of the arson, and believes them to be consistent in appearance, as depicted below.

Suspect #3                                          Jason Belotti

 

## TECHNICAL INFORMATION

27.    Based on my training and experience, I know that cellular telephone providers can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of the cellular telephones to which they provide service, including by initiating a signal to determine the location of the cellular telephone on cellular telephone provider networks or with such other reference points as may be reasonably available.

28.    In my training and experience, I have learned that cellular telephone providers are companies that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often

a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone, but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

29. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication.

30. Based on my training and experience, I know that cellular telephone providers can collect cell-site data about the cellular telephones using its network. I also know that wireless providers typically collect and retain cell-site and other cellular network data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. From this data, wireless providers can also estimate the historical locations of cellular telephones using their networks. These estimates are drawn from data collected in the normal course of business, including cell-site and other cellular network data.

31. I know that some providers of cellular telephone service, have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or

by triangulating on the device's signal using data from several of the provider's cell towers. I also know that certain wireless providers can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

32.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identity ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

33.     Based on my training and experience, I know that wireless providers typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the methods of payment (such as credit card account number) provided by the

subscriber to pay for wireless telephone service. I also know that wireless providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.

## AUTHORIZATION REQUEST

34.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

35.     I further request that the Court direct the Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on the Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

# ATTACHMENT A

## Matter No. 2020R00324

## Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number (262) 412-0919 (the "Subject Phone" or the "Account") that is stored at premises controlled by Metro PCS (T-Mobile), a wireless telephone service provider headquartered at 4 Sylvan Way in Parsippany, NJ 07054 (the "Provider").

## ATTACHMENT B

### Matter No. 2020R00324

### Particular Things to be Seized

**I.       Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to Account), for the time period from August 23, 2020 through August 26, 2020:

    a.  The following information about the customers or subscribers of the Account:

        i.  Names (including subscriber names, user names, and screen names);

        ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long distance telephone connection records;

        iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.  Length of service (including start date) and types of service utilized;

        vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received, including the locations of any cell tower and antenna face; and

iii. historical location records (including historical locational precision information, historical handset location data, estimated location records, geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information).

c. A list of definitions or keys identifying all information contained in the records.

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of the federal prohibitions against conspiracy to commit arson, in violation of Title 18, United States Code, Section 844(n), and arson of commercial property, in violation of Title 18, United States Code, Section 844(i).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.